UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| RELMAN, DANE & COLFAX PLLC ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FAIR HOUSING COUNCIL OF SAN ) <br> FERNANDO VALLEY and MEI LING ) <br> ) <br> ) <br> Defendants. ) <br> ) <br> ) | Civil No. 1:18-cv-00495-TNM |

**DECLARATION OF SHARON KINLAW IN SUPPORT OF DEFENDANT**

**FAIR HOUSING COUNCIL OF SAN FERNANDO VALLEY'S**

**MOTION TO DISMISS OR TRANSFER OR STAY**

I, Sharon Kinlaw, declare:

1. I am the Executive Director of the Fair Housing Council of San Fernando Valley (the "FHC"), a defendant in this case. I have personal knowledge of the facts stated herein and I could and would competently testify to those facts if called as a witness. I make this declaration in support of Fair Housing Council of San Fernando Valley's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Lack of Personal Jurisdiction and Improper Venue, or in the Alternative, to Stay the Action Pending Arbitration in California, or Transfer the Case to the Central District of California.

2. The FHC is a three employee non-profit operating on a shoestring budget and

located in a small office in Panorama City, California, a suburb of Los Angeles. Our primary work is to investigate complaints of housing discrimination, and help individuals (primarily disabled and low income) find fair housing solutions in the Los Angeles area.

3. In 2007, based on its community outreach and advocacy on behalf of individual clients with disabilities, the FHC came to discover that the City of Los Angeles and the Community Redevelopment Agency of the City of Los Angeles (the "CRA/LA") were systemically failing to provide affordable rental units meeting the heightened accessibility standards required by the Uniform Federal Accessibility Standards, the technical standard applicable under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.*

4. The FHC has long been involved in a "Fair Housing Laws and Litigation Conference" hosted by the Fair Housing Council of San Diego, California, and co-sponsored by other organizations, including the FHC. The Laws and Litigation Conference is held in San Diego, California in February every year, and has been for the past 25 years. It draws individuals involved in fair housing from across the nation, as well as government speakers, and law firms who would like to give presentations. Since the inception of the "Fair Housing Laws and Litigation" conferences in San Diego, John Relman and/or Relman attorneys have been regular participants, attending to network and give presentations. Over the years, I know the Relman firm has been represented at the conference by partner John Relman, partner Reed Colfax, partner Michael Allen and also Scott Chang to attend, network, and give presentations.

5. For the February 2010 Laws and Litigation Conference in San Diego, Relman firm partner Michael Allen attended, along with Relman firm attorney Scott Chang. Michael Allen

gave a presentation about his firm's recent Westchester County False Claims Act case.

6. In 2007, 2008, 2009 and 2010, three of the individuals with disabilities for whom I was working to find affordable and accessible housing in Los Angeles were Ali Jahanabad, Mei Ling and Sandy Varga. I attended the 2010 Laws and Litigation Conference in San Diego and Ali, Mei and Sandy also attended so they could possibly present their stories and explain the accessible housing violations we have seen. I believe Michael Allen gave his presentation in the morning of one of the Conference days, but I was not present for it as I was helping with hosting and logistics activities behind the scenes.

7. During the luncheon portion of the Conference that day, I asked Ali Jahanabad, a wheelchair user, to go to the front of the room near the podium and explain his story and the accessibility housing violations he had seen in the Los Angeles area. When Ali came back to where we were gathered near a pillar at the side of the room, Michael Allen immediately came over and wanted to know more about the Los Angeles housing violations we were aware of. Since we had been investigating violations within the Los Angeles area for the past three years and were hoping to find legal help for Ali, Mei and Sandy in resolving their individual housing issues and obtain a list of the affordable accessible units, I (along with Mei, Sandy and Ali) began telling him about what we had seen in our investigation and all the problems we had uncovered.

8. The FHC's interest and focus at the time was in finding a legal solution to help our disability clients Ali, Mei and Sandy, and other individuals who sought assistance from the FHC, and at that point we had not never considered pursuing some type of overall systemic violation lawsuit. We were just trying to help these people even though it was our experience that lawyers were not interested in taking their individual cases. Michael Allen said he would like to see what we had uncovered in our Los Angles area investigation and requested that we send copies of some of our documents to him.

9.      Within a few weeks, Michael Allen phoned the FHC (me) in Los Angeles after reviewing our documents and asked us more questions and requested that I send him more documents.  Over the next eight or nine months, Michael Allen would review our documents and then phone or email and ask us for more information.  He also asked us to do further investigation in Los Angeles.  He asked us to obtain City of Los Angeles budgets and City of Los Angeles certifications that it had submitted to obtain HUD grant fund draw downs.  We did as he requested.

10.     Finally, during one of his phone calls in (I think) October 2010, Michael Allen said he wanted to file a False Claims Act case in Los Angeles federal court based on our information. He solicited the FHC to be one of his clients for that lawsuit and he solicited Mei Ling as his other client for the lawsuit.  The FHC had never been involved in a False Claims Act case, and had no familiarity with the process and was skeptical.  But, Michael Allen kept saying he thought we would have a good case and he wanted to be our lawyer.

11.     The FHC had never worked with Mr. Allen or the Relman firm before, although the Relman firm did previously file a "friend of the court" brief supporting the FHC's position in a Ninth Circuit appellate case, and we knew the Relman firm had previously handled cases in San Francisco federal court for two other of the non-profits who regularly attended the San Diego "Laws and Litigation" conferences where the Relman firm attended and gave presentations each year.  We mentioned to Michael Allen the possibility of other lawyers who we would like to be involved if litigation occurred.  However, Mr. Allen did not want any other lawyers to be involved - - just the Relman firm.  Mr. Allen nixed the idea of other lawyers representing the FHC or Mei Ling in the proposed False Claims Act case, other than as the firm's "local counsel."

12.     In addition, Mr. Allen said he wanted to file a Fair Housing Act and other civil rights related case that included a Civil Rights Section 504 action on behalf of the FHC and allege systemic violations on behalf of the FHC and individual tenant *bona fides*.  We had concerns

3      Kinlaw Declaration in Support of Mo to Dismiss

because we had never been involved in a Section 504 systemic violations case of that magnitude and, again, we were uncertain because the City of Los Angeles wa the primary funder of the FHC. However, Mr. Allen kept saying he thought we would have a good case and that the Relman firm wanted to be our lawyer.

   13.  In late 2010, Michael Allen sent a Retainer Agreement for the FHC to sign for the proposed False Claims Act case his firm wanted to pursue. He had unilaterally inserted a Choice of Laws provision which we had never discussed. He never explained its impact to us. He did not explain how it might be different from our rights under California law or that we might be giving up any of our rights. We had never been involved with anything like this before and we thought it must be some standard language.

   14.  There was never any discussion with anyone from the Relman firm about the Attorneys' Fees portion of the Retainer Agreement. It was our experience from the civil rights types of cases that the FHC had been involved in bringing that attorneys would submit their fees to the court if possible and, if that was not possible, attorneys would get a percentage of a recovery. We thought this is what the Relman firm would be doing, but it was never explained by anyone from the Relman firm. However, our understanding of the Relman retainer agreement as it was written by the Relman firm indicates that it is a contingency agreement for "reasonable fees" based on its hourly rates, and that it gets nothing if the FHC does not recover. The retainer agreement also changes the fee from strictly an hourly-based (court-awarded) fee to a percentage fee, but <u>only</u> upon the occurrence of either one of two additional contingencies: 1) if the litigation is resolved by a lump sum settlement or offer of judgment that makes no separate provision for the recovery of hourly (court-awarded fees) and also actually waived the right to recover fees from the defendant, then the fee would be one third of the recovery if that amount surpassed its hourly rate, or 2) if the Relman firm pursued and won the case at summary judgment or trial, it could receive one third of

the recovery if that amount surpassed its hourly rate. A true and correct copy of the Relman retainer agreement is attached as Exhibit A.  A diagram of our understanding of how the fee was to be calculated from reading the retainer exhibit is attached as Exhibit B.  This diagram correctly tracks how the Relman firm FCA fee was to be calculated pursuant to the Relman drafted fee agreement in the event of a recovery.  At this time, none of the contingencies listed in the Relman retainer agreement have occurred. None of the contingencies listed in Relman's retainer agreement have occurred. There has been no recovery in the FCA case, including any recovery from a lump sum settlement or offer of judgment that does not allow for the recovery of hourly or court-awarded fees <u>and</u> actually waives the right to receive fees from the defendant, and the Relman firm has not won the FCA case at summary judgment or at trial. Kinlaw Decl.  If it is ever presented with such a proposed settlement that does not allow for the recovery of hourly or court-awarded fees and actually waives the right to receive the fees from the defendant, the FHC will reject it.

15.    In addition to the FHC, the other client of the Relman firm in the False Claims Act case was Mei Ling.  Ms. Ling, who uses a wheelchair, is one of the individuals for whom we had been trying to find accessible disability housing and she had also attended the 2010 Laws and Litigation Conference in San Diego where Mr. Allen came to us to ask about the violations we had uncovered.  There was no discussion by the Relman firm of what the conflicts would be between the two clients.  We were not told and never discussed how any recovery would be shared between the two clients.  Nor were we told what out of pocket costs either of the two clients would be responsible for, what percentage of costs either client would be responsible for, or whether the clients were jointly and severally liable for the costs. We just trusted that the Relman firm knew what it was doing.  They represented to us in California that they had pioneered False Claims Act fair housing litigation, were extremely experienced and the best in the country.  We had no knowledge or experience in this, so we trusted them.

16. The False Claims Act case was not the only case the Relman firm wanted to handle for the FHC in Los Angeles federal court. In addition to the False Claims Act case, the Relman firm convinced the FHC to file a Civil Rights case (including a Section 504 case) in federal court in Los Angeles based on the systemic violations we had uncovered in our investigation materials as to the City of Los Angeles and the Community Redevelopment Agency / Los Angeles during the prior three-plus years. However, rather than just have the FHC as the sole named plaintiff, Michael Allen solicited two other Los Angeles area non-profit agencies to also be named as plaintiffs - - even though it was the FHC's investigation that formed the basis for the case. Similarly, the Relman firm did not explain what the potential conflicts would be between the multiple clients in the Section 504 case. We were not told, and did not discuss, how any recovery would be shared between the multiple clients. Nor were we told what out of pocket costs any of the multiple clients would be responsible for.

17. The Section 504 case was filed in federal court in Los Angeles in 2012. That case concluded in a settlement in Los Angeles in which the Relman firm received approximately $16 million in fees. The three non-profit clients were to split a $4.5 million aggregate recovery.

18. Serious conflicts of interest occurred in the course of the Relman firm's representation in the Section 504 matter and negatively affected the FHC's best interests in the FCA matter, long before the FHC's termination of the Relman firm in the FCA case. In fact, on November 5, 2015, I attended a meeting in Los Angeles at the U.S. Attorney office with Assistant U.S. Attorney Lisa Palombo, John Relman, his partner Jenn Klar, and two other people from the FHC. During that meeting, I specifically asked AUSA Palombo if the FHC could talk with new attorneys about the case, as the FCA case was then currently under seal. Ms. Palombo confirmed that we could for the purpose of hiring new counsel, without the need to apply for a partial lifting of the seal. After the meeting, the FHC representatives went to lunch and included John Relman

and his partner. John Relman was quiet during the lunch, and about the only thing he said was to ask us if we were going to fire the Relman firm from the FCA case. This was more than a year before the FHC actually fired the Relman firm. Because the FHC charged their lunch on a credit card, I have been able to look up the date and know it was November 5, 2015, more than a year before we finally terminated the Relman firm. Despite our grave concerns about continuing to be represented in the FCA case by the Relman firm, we continued to try to make it work with the firm over the next year. Because the FHC had invested so much effort in its investigation and the litigation process, we felt for many months that we had no realistic choice. But the situation with the Relman firm kept deteriorating and included serious conflicts that finally brought the FHC to the breaking point. These conflicts in the Section 504 case were directly related to actions taken by the Relman firm. For example:

    i.    Until June 2017, the FCA matter was conducted under seal. Without knowledge or consent of the FHC, the Relman firm sought and received permission from the FCA court in Los Angeles to share information regarding the FCA matter with the two other Section 504 plaintiffs in California in 2015. When the FHC learned of this more than a year later, it expressed its objection, but felt that it was without a remedy at that point. After the Firm revealed to the two other Section 504 Plaintiffs that the FHC might potentially receive additional damages pursuant to the FCA case, relations soured between other Plaintiffs in the Section 504 case and the FHC. This souring was of particular concern to the FHC, for the FHC and one of the other non-profit Plaintiffs had worked together amicably on other matters for 20 years or so prior to this rift. The FHC's fair housing work relationship with the other non-profit was developing and there had been no issues between the three agencies, who had worked well together in the past.

    ii.    The FHC comprised and documented approximately two thirds of the three

Plaintiffs' total damages submitted during settlement discussions in the Section 504 case. The City countered with a lump sum/aggregate settlement offer which was less than the FHC's documented damages and more than the other two plaintiffs' documented damages; the plaintiffs decided to accept the lump sum offer. John Relman even told the FHC that the City Manager for the City of Los Angeles explained the reason the City offered $4.5 million was because of what the FHC had been through and endured in trying to bring these issues to the forefront. This means the City's offer was based largely on the FHC's damages submitted at the time. The plaintiffs had to then decide how to divide the City's aggregate offer. As noted above, the Relman firm had never explained to the Section 504 Plaintiffs this foreseeable conflict that would almost certainly arise in the event of a settlement, and there was no provision made up to resolve conflicts of interests. The head of the Relman Firm, John Relman, said he would mediate between and among the Section 504 Plaintiffs. In the course of this mediation process, which occurred with Mr. Relman in California, Mr. Relman made statements that compromised the FHC's position and favored the other Plaintiffs, and later the Relman firm helped the other two Section 504 plaintiffs revise their damages upward and worked to minimize the FHC's damages. On the basis of these statements, the FHC insisted that Mr. Relman withdraw as settlement mediator. A trained mediator was then sought.

   iii. The Relman firm on several occasions told the FHC that it should forego a portion of its Section 504 damages in favor of the other Section 504 Plaintiffs, because the FHC would potentially have access to additional monetary damages from the FCA case.

   iv. Mr. Relman came to California to conduct the first mediation, where he suggested to all of the three plaintiffs that the FHC should recalculate its damages to the benefit of the other plaintiffs - - even though it was our work which had formed the back

8  Kinlaw Declaration in Support of Mo to Dismiss

bone of the information to file the Section 504 case. The first mediation with Mr. Relman in California did not resolve the conflict; a second and then third mediation was scheduled with new mediators in California. Prior to these mediations, the Relman firm created additional conflicts which further compromised the FHC's position and favored the other plaintiffs, including but not limited to selecting and influencing one of the new mediators and providing only selected information to the mediator which increased the damages of the other two plaintiffs and short changed the FHC's damages position. In addition, the Relman firm also chose not to give the new mediator the original lower damages calculations submitted by the other two Section 504 plaintiffs, all of which led to the FHC's need to hire separate attorneys to deal with the Relman firm and protect the FHC's interests.

19. The FHC found itself between a rock and a hard place - at odds with its primary counsel over conflicts of interests but still needing the Relman firm to continue to provide services on the Section 504 case because the implementation terms of the settlement agreement had not been resolved. This was further complicated by the fact that the Relman firm had pursued a strategy that inextricably linked both the Section 504 case with the FCA case.

20. In addition, the Relman firm denied the FHC access to investigative and discovery materials in the Section 504 case although I had requested same on behalf the FHC. Access to these documents would have assisted our newly hired Section 504 counsel in showing our damages and in protecting the FHC's interests from the Relman firm's conduct.

21. In May 2016, after the Section 504 case settlement was signed by the FHC and other plaintiffs to have the City of Los Angeles retrofit housing units with accessibility features (and pay millions in fees to the Relman firm), the Relman firm recommended to the FHC that we enter into a side letter agreement with the City of Los Angeles stating we would support or not

oppose a reduction in any amount of a potential False Claims Act settlement because the City of Los Angeles would already be paying for retrofits in the Section 504 case settlement. The FHC strongly objected to this and told the Relman firm this was unethical and immoral to recommend to us that we support or not oppose the City of Los Angeles paying less in a False Claims Act case settlement because it was already paying in the Section 504 case. We told the Relman firm this was unethical for several reasons, including the fact that this would mean the FHC's False Claims Act case value would go to benefit the two non-profit plaintiffs the Relman firm had solicited to join the FHC's Section 504 case (and who were not a part of the False Claims Act case). This was also unethical because this would mean the co-plaintiff in the False Claims Act case (Mei Ling) would have her False Claims Act case value lessened to benefit the Section 504 case of which she was not even a part. For the Relman firm to recommend that the FHC enter into such a side letter agreement was a breach of trust, and we refused to do so. It was clear to us that the Relman firm wanted to wrap up the Section 504 case and take its $16 million fee at the expense of the best interests of the FHC and also Mei Ling in any potential future False Claims Act recovery.

22. In trying to convince the FHC to sign the side letter agreement, it is my recollection that Relman attorney Michael Allen was untruthful with us with regard to the actual language of the side agreement and Mei Ling's approval position on the side agreement. Mei Ling has since confirmed to us that she never did and never would have agreed to any such side agreement. In fact, when Mei Ling learned about the Relman firm recommending that the FHC enter into a Side Agreement in the Section 504 case stating the FHC agreed not to oppose the City of Los Angeles paying less in a False Claims Act case settlement because it was already paying in the Section 504 case, she fired the Relman firm. Ms. Ling confirmed to the FHC that she had never heard about this from the Relman firm. She only learned about it because the FHC decided to waive the attorney-client nature of Relman's recommendation and inform Mei Ling. As a result of the

Relman conduct, in December 2016, Mei Ling terminated the Relman firm from any further representation in the FCA case. Following its termination, on September 17, 2017 the Relman firm, represented by a California attorney, filed a notice of appearance and lien for attorney's fees in the Los Angeles FCA case against Mei Ling asserting the same claim to fees that it has now brought in the District of Columbia against Mei Ling in this more recent case.

23. When the FHC saw that the Relman firm was repeatedly not looking out for our interests, was taking positions contrary to our interests, was creating additional conflicts not only in the Section 504 case but also in the FCA case, was not being truthful with us, and that we would surely be having a repeat of the "lump sum / aggregate settlement" conflicts that we now realized would occur if we were to be successful in the FCA case, the FHC finally decided to:

    i. Have the Relman Firm complete its representation of the FHC on substantive discovery and litigation issues related to the Section 504 matter.

    ii. Retain the services of separate counsel to assist in negotiating Section 504 case settlements with the City of Los Angeles and CRA/LA, improve communications with the Relman Firm, transmit court filings and related documents to the FHC in the Section 504 matter which we had been unable to get from the Relman firm, and to protect the FHC's mission and financial interest in the Section 504 litigation.

    iii. Hire separate counsel to monitor the implementation of the various Section 504 issues and related matters, and

    iv. Replace the Relman firm in the FCA matter with a firm that would look out for the FHC's interests.

24. As a result, I prepared and sent an email to the Relman firm in December 2016, terminating the Relman firm's representation of the FHC in the FCA case. The FHC had already paid out more than $100 thousand dollars to separate counsel to protect us from the Relman firm's

conduct and to manage the conflicts we did not create, while attempting to maintain a cordial and professional relationship with all parties involved. My termination email is attached to this Declaration as Exhibit C.  In the termination of the Relman firm from the FCA case, I attempted to reference some of the issues discussed above, as I explained the following:

Dec. 18, 2016

Michael Allen and John Relman

  We believe your firm has not been forthcoming as it relates to your communications with the City (and others) about the FCA case. As such, we believe that the civil rights of persons with disabilities, taxpayer dollars and the relator's interest have been severely put at risk.

  After many months of thoughtful deliberation contemplating this decision, we are now requesting that Relman, Dane & Colfax lawyers have no further communication (on behalf of the FHC) with Lisa Palombo, Eric Schmelzers or any other DOJ, HUD or City employee including, but not limited to Miquel Santana, Jim Clark or Harvey Korman as it relates to the False Claims matter and/or global settlement discussions.

  Moreover, we believe Relman, Dane & Colfax have disqualified itself from the False Claims Act case. For some time now, we have expressed our concern related to your law firm using the FCA matter in a global settlement context as leverage in the 504 case, we have also made known our objections regarding your communications with the City regarding the "side letter".

  As a matter of justice, we believe it is reprehensible under any circumstances to provide a "credit" to offset damages paid for deceiving taxpayers and violating civil rights law. To request or suggest otherwise is offensive to the Fair Housing Council's mission and sets a bad precedent as a matter of moral turpitude.

  Lastly, there are several other previously identified concerns which call into question how your firm's fiduciary obligations to the Fair Housing Council have not been met. We have requested and are waiting to receive your billing records; we ask that you forward the information to us so that we may immediately begin to discuss and negotiate your fees and expenses relative to the retainer agreement.

  Should you have any further questions or concerns, we ask that you direct them to David Iyalomhe and/or Odion Okojie.

Respectfully submitted,

Sharon Kinlaw
Executive Director
Fair Housing Council of the San Fernando Valley

25. After we terminated the Relman firm, we retained new FCA counsel who attempted to obtain from Relman what percentage of the Relman firm's costs and contingent hourly fees would be charged and allocated to the FHC in Relman's dual representation of the FHC and Mei Ling. These attempts were unsuccessful. To this day, the Relman firm still has never explained to the FHC what percentage of the Relman firm's costs and contingent hourly fees are to be charged and allocated to the FHC. The Relman firm has never explained to the FHC what percentage of its costs will affect the FHC's recovery, if any, in the FCA case. The Relman firm still has never explained to the FHC what percentage of the Relman firm's costs and contingent hourly fees are to be charged to the FHC. The Relman firm has never explained to the FHC what percentage of its costs will affect the FHC's recovery, if any, in the FCA case. The Retainer Agreement for the FCA case does state what percentage of the Relman firm's costs are to be charged to the FHC and affect the FHC's recovery. The Retainer Agreement for the FCA case does not state whether the two separate clients are jointly and severally liable for the costs. The Retainer Agreement for the FCA case does not describe what percentage of the Relman firm's contingent hourly fees are to be charged to the FHC and affect the FHC's recovery.

26. The FCA case was filed approximately seven years ago, and the government's complaint was filed in July 2017. However, no answer has been filed by any defendant, no discovery has begun and no scheduling order has been issued. In fact, the defendants in the FCA case recently filed comprehensive Motions to Dismiss, and the parties have submitted hundreds of

pages of briefing and exhibits to the Federal Court in Los Angeles for the FCA matter, including substantial briefing submitted on behalf of the FHC by its new FCA attorneys in Los Angeles pertaining to the statute of limitations and repose under the FCA and complicated "arm of the state" immunity issues. Further, the Federal Court in Los Angeles has requested additional briefing from the government and the defendants. The hearing for the Motions to Dismiss the FCA case are scheduled for April 30, 2018. Thus, active litigation in the FCA case is just commencing and, the FHC has been informed that no settlement discussions are ongoing.

27. The FHC is based in a suburb of Los Angeles, and has always been based and offered its services only in the Los Angeles area. The FHC has no offices in the District of Columbia or anywhere else. The FHC has no business facilities, no employees, and no registered agents in the District of Columbia or anywhere other than California.

28. We were solicited by Michael Allen in California to be Relman firm clients for the FCA case, which involved Los Angeles, California issues, was filed in Federal Court in Los Angeles, and all the in-person interactions in which we were involved occurred in the Los Angeles area. We never attended any FCA case meetings or Section 504 case meetings or any meetings about anything with the Relman firm in the District of Columbia. Our meetings with the Relman firm were always in Los Angeles. The only times in the last ten years that an FHC representative has been to the District of Columbia were on rare occasions to meet with legislative or agency representatives about the foreclosure crisis although, for the first time, I have been asked to be on a panel at an upcoming conference next week in D.C. and will be attending.

29. Any materials we sent to the Relman firm in the District of Columbia for the FCA case or the Section 54 case were simply done at the Relman firm's direction that we do so. Those directions by the Relman firm were either made to us in person in California, or made to us in

California in phone calls placed to us in California by the Relman firm, or made to us in emails sent to us in California by the Relman firm.

30. The in-person interactions with the Relman firm all occurred in California.

31. The FHC never came to the District of Columbia to seek out the Relman firm for either the FCA case or the Section 504 case, or did anything in the District of Columbia to seek out the Relman firm for either the FCA case or the Section 504 case.  It was the Relman firm who came to California and first spoke with us about our concerns, and the Relman firm who solicited the FHC in California to be its client in California for these cases the Relman firm wanted to pursue in California.

32. No portion of the FCA lawsuit or the Section 504 lawsuit was ever litigated on the District of Columbia.  The litigation was in the Federal Court in Los Angeles only.

33. At no point was the FHC requested to conduct any work outside California with respect to these matters and at no point did the FHC perform any work inside the District of Columbia.

34. The FHC is not registered or qualified to transact business in the District of Columbia.  The FHC is only registered and qualified to transact business in California.

35. The FHC has never had an office, agent or property in the District of Columbia and it has never reached into the District of Columbia to solicit or initiate business (other than to meet with federal agency personnel or legislators about policy issues - - which conduct is exempt from the District of Columbia long arm statute).

36. The FHC has not transacted any business within the District of Columbia's borders.

37. The FHC has no ongoing contacts or business relationships with the District of Columbia or any residents therein.

38. The FHC has never contracted to supply any services or things within the District of Columbia.

39. The FHC has not made any acts or omissions within the District of Columbia giving rise to any actionable conduct.

40. The FHC does not have an interest in any real property in the District of Columbia.

41. The FHC does not derive revenue from goods used or consumed or services rendered by it in the District of Columbia.

42. The FHC has never incurred any tangible personal property tax liabilities in the District of Columbia.

43. The FHC has never undertaken any transaction or activity to avail itself of any benefit or obligation under the laws of the District of Columbia.

44. Regular travel to the District of Columbia to defend this lawsuit will be very onerous and expensive and will inevitably take a heavy toll on the FHC's ability to perform its non-profit goal of finding fair housing solutions for disabled and low income people in the Los Angeles area.

45. On information and belief, all potential witnesses in this case do not live or work the District of Columbia. The only exception to this are the witnesses from the Relman firm - - the firm that solicited the FHC in California to be its client in California for the federal cases the Relman firm wanted to pursue in California. One of the Relman firm's former attorneys who made an appearance in the Federal Court in Los Angeles in the these cases (Scott Chang) is a California lawyer who currently works and resides in California. Relman firm attorney Jamie L. Crook (who also represented the FHC in the FCA case in the federal court in Los Angeles) has

been a California lawyer since 2006 and remains a member of the California bar. Additionally, Mitchell Kamin, the California lawyer the Relman firm retained to file its Notice of Lien against Mei Ling in the Los Angeles FCA case, is a member of the Covington and Burling firm whose District of Columbia office appears to have now joined with Kamin and its Los Angeles office to multiply the proceedings by pursuing the Relman firm's fee issues with Mei Ling and the FHC in the District of Columbia courts, while Kamin remains as attorney of record for the Relman firm in the Los Angeles FCA case on the Relman firm's fee lien.

46. After we terminated the Relman firm and retained new FCA counsel, and following a review of the terms of the Relman retainer agreement and unsuccessful attempts by our new attorneys to obtain a basic breakdown of the Relman firm's allocation of its contingent hourly fees and costs claim against the FHC, versus its contingent claim for fees and costs against Mei Ling, we authorized our new attorneys to advise counsel for the Relman firm that we were exercising our option to void the contingency agreement pursuant to California Business & Professions Code § 6147(b), which was accomplished on October 23, 2017.

47. On March 23, 2018, pursuant to California's Mandatory Fee Arbitration Act, California Business & Professions Code § 6201(b), the FHC submitted a Client Petition for Arbitration, Exhibit D, to the Los Angeles County Bar Association, Attorney-Client Mediation and Arbitration Services, and served a copy on counsel for the Relman firm via email on March 26, 2018.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April, 6, 2018, in Panorama City, California.

*Sharon Kinlaw*
Sharon Kinlaw, Executive Director of the
Fair Housing Council of San Fernando Valley